**VIRGINIA VERMICULITE, LTD., Plaintiff,**

v.

**W.R. GRACE & CO.–CONN., The Historic Green Springs, Inc., Defendants.**

**VIRGINIA VERMICULITE, LTD., Plaintiff,**

v.

**W.R. GRACE & CO.–CONN., Defendant.**

**M.F. PEERS, Jr. & Norma Peers, Virginia Vermiculite, Ltd., Plaintiffs**

v.

**W.R. GRACE & CO.–CONN., Defendant.**

Civil Action Nos. 95–0015–C, 96–0012–C and 96–0013–C.

United States District Court, W.D. Virginia, Charlottesville Division.

April 22, 1997.

804

Jane Champion Clarke, David Zev Izakowitz, Woods, Rogers & Hazlegrove, P.L.C., Charlottesville, VA, for Virginia Vermiculite, Ltd.

Roger Scott Martin, Martin & Woodard, P.L.C., Charlottesville, VA, for M.F. Peers, Jr., Norma Peers.

Thomas Eugene Albro, Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, David S. Copeland, Randolph S. Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, for W.R. Grace & Co.–Conn.

Charles H. Montange, Seattle, WA, Sara Lee Gropen, Rae H. Ely & Associates, Louisa, VA, for Historic Green Springs, Inc.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This case comes to the court pursuant to 28 U.S.C. § 636(b)(1) on objections to United States Magistrate Judge B. Waugh Crigler's Reports and Recommendations, the first issued on September 19, 1995, and the second issued on September 19, 1996, in the above-captioned cases. Also, before the court is a motion to amend one of the complaints, filed on October 18, 1996. Because the three above-captioned cases are closely related, the

court will resolve all outstanding issues in a single opinion.

## I. MOTION TO AMEND COMPLAINT

Plaintiff Virginia Vermiculite, LTD. ("VVL") moves the court to permit it to amend its First Amended Complaint. Defendant W.R. Grace & Co.-Conn. ("Grace") does not object; Defendant The Historic Green Springs, Inc. ("HGSI"), however, opposes the motion to amend, if only tepidly so. *See* Transcript of January 31, 1997 Hearing at 6–7.

■ Fed.R.Civ.P. 15(a) directs that "leave [to amend a complaint] shall be freely given when justice so requires." According to its own statement Grace will suffer no prejudice from the amendment. As will become clear from the discussion below, neither will HGSI be prejudiced by an amendment. Meanwhile, VVL's amendment removes allegations that no longer hold true and adds relevant allegations not made in its earlier complaints. The court sees no reason—given Grace's acquiescence—to analyze the case on an outdated complaint. Therefore, the court will grant VVL's motion to amend.

## II. BACKGROUND

The court is presented with the novel argument that the federal antitrust laws require nullification of a donation to a nonprofit preservation organization. Attacking the donation are the donor's business competitor and two landowners who entered into a contract with the donor. The subject of the donation and the substance around which these peculiar cases revolve is a substance called vermiculite. "Vermiculite is a unique mineral in that it is fireproof and rapidly expands approximately ten-fold in volume when heated to produce a low-density material. Vermiculite has valuable uses throughout the United States in fire safety, energy conservation, construction, environmental products, food processing and horticulture. Vermiculite also has promising new applications including detoxification of water and soil, nuclear waste containment and removal, and industrial spill containment and cleanup." Second Amended and Supplemental Complaint ("Second Amended Complaint")

¶ 10, *Virginia Vermiculite, Ltd. v. WR Grace & Co.-Conn.,* No. 95–0015–C (October 18, 1996). Vermiculite is obtained through mining; after it is removed from the ground, it must be taken to a processing plant (relatively close to the mining site) and separated from the rock, dirt, and clay in which it is embedded. *Id.* ¶ 11. In the United States, vermiculite is currently mined in South Carolina and Virginia, the only two states where substantial vermiculite reserves are known to exist, other than Montana, whose deposits are believed to be contaminated. *Id.* ¶¶ 16, 17. A significant portion of vermiculite is also obtained from South Africa; for instance, in 1992, approximately eighteen percent of all vermiculite sold in the United States was imported from South Africa. *Id.* ¶ 19. In the past, however, foreign exporters of vermiculite have not responded to fluctuations in vermiculite price in the United States. *Id.* ¶ 21.

VVL, a Virginia limited partnership, mines and sells vermiculite; hence, it is a consumer of vermiculite mining rights and a producer of vermiculite concentrates. *Id.* ¶ 63. It has been involved in vermiculite mining in Louisa County, Virginia since 1976. *Id.* ¶¶ 4, 13. VVL sells a substantial percentage of all vermiculite sold in the United States; in 1992, its share of the market was approximately twenty-three percent of all sales. *Id.* ¶ 19. Its only formidable domestic competitor is Grace, a Connecticut corporation; in 1992, Grace owned more than eighty percent of vermiculite mining rights (in Louisa County, Virginia and South Carolina) and was responsible for approximately fifty-seven percent of all vermiculite sold in the United States. *Id.* ¶¶ 5, 19, 26. Until 1990, Grace mined vermiculite in South Carolina and Montana only, even though it owned vermiculite mining rights in Louisa County; after 1990, Grace abandoned the mines in Montana, apparently because of the contamination, but continued mining in South Carolina. *Id.* ¶¶ 14, 15, 17.

In 1991, Grace invited VVL to make an offer to purchase all of Grace's holdings in Louisa County. *Id.* ¶ 23. VVL submitted

an offer, which Grace rejected.[1] *Id.* ¶ 24. Instead of making a counter-offer, Grace donated its holdings to a nonprofit Virginia corporation, HGSI. *Id.* ¶¶ 6, 25, 37, 38, 43, 44, 51, 53. Grace's "compensation" for the donation came from the Internal Revenue Service in the form of a hefty tax deduction. *Id.* ¶ 25. For HGSI, the benefit of the donation exceeded the simple pecuniary gain of land and mining rights.

Since the early 1970s, HGSI's stated purpose has been to halt all vermiculite mining and other land development that adversely impacts land (values) in Louisa County, Virginia. *Id.* ¶¶ 29, 32, 33, 34, 35. Indeed, for some twenty years, HGSI has fought to acquire vermiculite mining rights and has "conducted a campaign" against Grace to persuade Grace to surrender its mining rights in Louisa County to HGSI. *Id.* ¶ 36. HGSI's corporate charter announces its purpose as follows:

> [HGSI] is organized for charitable and educational purposes: to maintain and protect the beautiful and historic Green Springs area[, a designated national historic landmark] as an important heritage for the State of Virginia and her people, without pecuniary gain or profit to its members or to any private individual and not to engage in a regular business of a kind ordinarily carried on for profit. Its purposes shall include historical and ecological research and education; the development of a community land-use plan to eliminate blight and prevent future deterioration; rendering assistance to like oriented organizations (historical and environmental).

*Id.* ¶¶ 29, 30.

Grace's first donation to HGSI, made in 1992, was accompanied by restrictive covenants imposed to "run with the land and be binding upon [HGSI] and upon all persons, firms, partnerships, corporations, limited liability companies, and all other legal entities of any type owning all or any part of the Real Estate." *Id.* ¶ 43. The covenant further directed that HGSI "agrees for itself and all of its successors in title or interest, and its assigns, that the Restrictive Covenants shall run with the land." *Id.* The Restrictive Covenants prohibited any part of the land ever to "be used or operated for the purpose of Mining or Mineral Production," id., without regard to the possibility of successful reclamation. *Id.*

As a result of an unsuccessful suit HGSI brought to prevent mining by VVL—which owned mining rights to a property adjoining one of the 1992 conveyances to HGSI—the restrictive covenants were found by a Virginia state court to have breached the implied covenant of good faith. *Id.* ¶¶ 44–49. After the state court ruling invalidated these restrictive covenants, Grace made another donation to HGSI in 1994, this time without a recorded restriction on mining. *Id.* ¶¶ 49, 51. The restrictions contained in the 1992 conveyances were subsequently narrowed by the parties to prohibit only vermiculite mining as opposed to all mining. *Id.* ¶¶ 53, 55.

As a consequence of the 1992 and 1994 transactions, VVL brought suit against Grace and HGSI on February 21, 1995. At the Magistrate's request,[2] on May 31, 1995, VVL filed its First Amended Complaint. Because the court has granted VVL's motion to amend this complaint, now before the court is VVL's Second Amended Complaint. VVL believes it has been injured both as a consumer (of mining rights) and a producer (of vermiculite concentrate) by the contract between Grace and HGSI, which VVL claims to have resulted in the suppression of eighty percent of the vermiculite supply in Louisa County and forty percent of the vermiculite supply in the United States. *Id.* ¶¶ 59, 60. According to VVL, the contract (whether explicit or implicit) prohibiting all future mining of vermiculite unreasonably burdens trade through its restraint of the "vermiculite mining rights market" in Louisa County and South Carolina and the "vermiculite concentrates market" in the United States. *Id.* ¶¶ 68, 76, 79, 90, 93, 101. VVL complains that the contract between Grace and HGSI,

---

1. Although VVL speculates in its memoranda that the offer was a sham, its complaint contains no such allegation.

2. The Magistrate requested VVL to amend its complaint to clarify the basis upon which HGSI could be held liable.

in which they agree (expressly or implicitly) that no vermiculite mining will ever be performed, hinders it (or other potentially interested parties) from acquiring vermiculite mining rights, mining vermiculite, and selling vermiculite. *Id.* ¶ 70. The donation, VVL asserts, was an exclusionary act employed by Grace to achieve (or attempt to achieve) monopoly power in the vermiculite concentrates market in the United States. *Id.* ¶ 76. VVL claims that as a consequence its business has depreciated in value and it has suffered increased costs and lost profits. *Id.* at p. 20. As a remedy, VVL seeks damages for past and future harm and equitable relief entailing a rescission of the conveyances and divestiture of the interests from Grace.[3]

Count I alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (unlawful combination or conspiracy in restraint of trade) by Grace and HGSI; Count II and III allege a violation of the Sherman Antitrust Act, 15 U.S.C. § 2 (monopolization and attempted monopolization) by Grace only;[4] Count IV alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 2 (conspiracy to monopolize) by Grace and HGSI; Count V alleges a violation of the Virginia Antitrust Act, §§ 59.1–9.1 *et seq.* (antitrust violations that mirror federal law) by Grace and HGSI; and Count VI alleges a violation of Va.Code § 18.2–499 (conspiracy to injure another in trade, business, or profession) by Grace and HGSI.

The Magistrate Judge issued a Report and Recommendation on September 19, 1995, recommending dismissal of Counts I, II, and III pursuant to Fed.R.Civ.P. 12(b)(6);[5] the Magistrate declined to exercise jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c) and recommended that they be dismissed without prejudice. Objections followed. On December 28, 1995, upon motion by VVL, proceedings in the case were stayed so that VVL could determine the sta-

tus of certain conveyances to HGSI. On motion of both parties, the stay was lifted on November 1, 1996, and VVL filed a motion to amend and supplement the First Amended Complaint with a Second Amended Complaint (which the court herein granted). The objections to the Magistrate's September 19, 1995 Report and Recommendation are now before the court. This, however, does not end the saga of Grace under fire.

On March 12, 1996, two additional, virtually identical, complaints were filed against Grace, one by VVL alone, *Virginia Vermiculite, LTD., v. W.R. Grace & Co.-Conn.,* Civil Action No. 96–0012–C (*"Peers I"*), and the other by Plaintiffs VVL, M.F. Peers, Jr., and Norma Peers, *M.F. Peers, Jr., Norma Peers, and Virginia Vermiculite, LTD.,* Civil Action No. 96–0013–C (*"Peers II"*). Because the two Peers cases involve the same facts, parties, and legal issues, the cases were later consolidated. *See* Order of September 16, 1996, by United States Magistrate Judge B. Waugh Crigler. Accordingly, the court will refer to the cases collectively as the *Peers* cases, and, unless otherwise indicated, the court's reasoning and holding will have similar application to both cases.

Alfred D. Peers and Elizabeth D. Peers ("Peers I") and M.F. Peers, Jr. and Norma Peers ("Peers II") are, respectively, spouses who reside in Virginia (collectively "Peers"). Complaint ("Peers I Complaint") ¶ 9, *Virginia Vermiculite, Ltd. v. WR. Grace & Co.,* No. 96–0012–C (March 12, 1996); Complaint ("Peers II Complaint") ¶ 7, *M.F. Peers, Jr., Norma Peers, and Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,* No. 96–0013–C (March 12, 1996). In the early 1970s, the Peers conveyed land containing vermiculite deposits to Grace. Peers I Complaint ¶¶ 9, 10; Peers II Complaint ¶¶ 10, 11. Part of the consideration for the conveyances was the right to receive royalties for each ton of vermiculite mined from the land, if Grace,

---

**3.** Of course, a request for attorney's fees and costs follows.

**4.** In VVL's previous complaints, Counts II and III named HGSI as a defendant.

**5.** The Magistrate reasoned that because VVL had no reasonable expectation of acquiring Grace's

vermiculite holdings all claims under the Sherman Antitrust Act should be dismissed. Also, the Magistrate found that VVL's complaint failed adequately to plead the necessary elements to support its claims. The separate conspiracy to monopolize count was not contained in VVL's previous complaints.

solely in its discretion, chose to mine. Peers I Complaint ¶¶ 11, 25; Peers II Complaint ¶¶ 12, 26. In 1992, Grace donated, the conveyances it received from the Peers to HGSI along with its other vermiculite holdings. Peers I Complaint ¶ 15; Peers II Complaint ¶ 15. Consequently, the Peers lost any possibility of receiving royalties, a loss for which they have received no compensation. Peers I Complaint ¶¶ 18, 19; Peers II Complaint ¶¶ 19, 20. The Peers I assigned 100% of their interest in their claims against Grace to VVL, and the Peers II assigned to VVL a 65% interest in their claims against Grace. Peers I Complaint ¶ 20; Peers II Complaint ¶ 21. Essentially, the Peers claim they have been injured because the conveyances by Grace deprive them of the benefit of the bargain they struck with Grace. The Peers seek damages, attorney's fees, and costs.

In both complaints, Count I alleges unjust enrichment; Count II alleges breach of contractual duty to exercise discretion in good faith; Count III alleges a breach of contractual duty to pay royalties (on a "constructive mining" theory); Count IV alleges waste; Count V alleges conversion; and Count VI alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (unlawful combination or conspiracy in restraint of trade).[6]

On September 19, 1996, the Magistrate Judge recommended that Count VI be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) on the same grounds as those stated in his Report and Recommendation issued a year earlier. The Magistrate recommended dismissing without prejudice the remaining counts (claims pursuant to Virginia state law), declining to exercise jurisdiction under 28 U.S.C. § 1367(c). The parties filed objections, currently before the court.

### III. DISPOSITION OF CASES

For reasons different from those relied upon by the Magistrate, the court holds that all of the Peers' claims against Grace must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), including the state law claims, which the court will address pursuant to 28 U.S.C. § 1367(a). Again, for different reasons than those of the Magistrate, the court holds that

Count I of VVL's complaint must be dismissed; pursuant to § 1367(a), the court will exercise jurisdiction over VVL's state law claims and dismiss Count V, except insofar as Count V alleges unlawful monopolization, an unlawful attempt to monopolize, or conspiracy to monopolize against Grace (but not HGSI). The court will dismiss Count VI insofar as it applies to HGSI, but not insofar as it applies to Grace. Hence, HGSI must be dismissed as a defendant in this case; Grace remains in the case brought by VVL under Count II (monopolization), Count HI (attempted monopolization), Count IV (conspiracy to monopolize), Count V (state law antitrust claims alleging monopolization, attempted monopolization, and conspiracy to monopolize), and Count VI (state law civil conspiracy claim). Because, with respect to the Section 1 claims, the Peers advance arguments and allegations largely identical in pertinent part to those of VVL, the court's disposition of VVL's Section 1 claim will apply equally to the Peers' Section 1 claims.

### IV. STANDARD UNDER FED. R. CIV. P. 12(b)(6)

■ Under Rule 12(b)(6) of the Federal Rules of Civil Procedure "failure to state a claim upon which relief can be granted" provides grounds for dismissal. For purposes of a Rule 12(b)(6) motion, all factual allegations in the plaintiff's complaint must be accepted as true. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217–18 (4th Cir.1994). The plaintiff's complaint ought not be dismissed unless it is apparent that the plaintiff "would not be entitled to relief under any facts which could be proved in support of [his] claim[s]." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In determining whether to dismiss a claim under the Sherman Antitrust Act under Rule 12(b)(6), "allegations covering all the elements that comprise the theory for relief" must be stated. *United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954); *Miller & Smith*, 14 F.3d at

---

6. HGSI is not a defendant in the Peers cases.

220 (quoting *Municipal Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1501 (11th Cir.1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.")). If the plaintiff has not alleged the facts necessary to support his claim, such facts will not be assumed by the court to exist. *Miller & Smith*, 14 F.3d at 221.

## V. SECTION 1 CLAIMS

### A. APPLICABILITY OF SECTION 1 TO HGSI

The threshold question in this case is whether Section 1 of the Sherman Antitrust Act can be used as a tool against HGSI, or whether these "facts have been forced into an antitrust mold to achieve federal jurisdiction." *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 559 (7th Cir.1980).

### 1. LEGAL STANDARD UNDER SECTION 1 AS IT APPLIES TO NON-PROFIT ORGANIZATIONS

Section 1 of the Sherman Antitrust Act provides, in pertinent part, as follows:

> Every contract, combination, ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal.

15 U.S.C. § 1.

■ Section 1 of the Sherman Antitrust Act carries a smaller stick than this expansive language would suggest. Contrary to its simplistically all-encompassing directive, not every contract, combination, or conspiracy that restrains trade violates the Act. *See National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2958–59, 82 L.Ed.2d 70 (1984). Since most business contracts can be said to restrain trade, few would be safe were the plain language of the Act to be taken at its word.[7] *See Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911) (stating that the language is "broad enough to embrace every conceivable contract ... in the whole field of human activity"). Therefore, even if one believes, with Justice Scalia, that legislative history should not aid, let alone displace, interpretation of clear statutory language,[8] the Sherman Antitrust Act forces its students to glean meaning from congressional debates. *See National Organization for Women ["NOW"] v. Scheidler*, 968 F.2d 612, 617 (7th Cir.1992) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489, 60 S.Ct. 982, 989–90, 84 L.Ed. 1311 (1940)), *revd on other grounds*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

■ Although there has been substantial dispute among commentators as to the appropriate meaning to be derived from the legislative history of the Act, few would disagree about the Act's core purpose. *See* Einer Richard Elhauge, The Scope of Antitrust Process, 104 Harv. L.Rev. 667, 697–98 (1991) (citing different theories of scholars);[9]

---

7. The Supreme Court has carved out various exceptions. *See, e.g., United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (holding that the Act does not cover attempts to influence executive to adopt labor standards); *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (holding that using false information to persuade state governmental actors to enact legislation that injures competitors is not actionable under the Act); *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (holding that unless objectively baseless, litigation is protected under the *Noerr–Pennington* Doctrine, which protects right to petition government); *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (holding state action exempt from purview of the Act); *NAACP v. Claiborne*

Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (holding that consumer boycott of businesses organized by blacks to achieve racial equality could not be reached by state antitrust laws); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 484, 60 S.Ct. 982, 986–87, 84 L.Ed. 1311 (1940) (holding that violent union take over of factory did not implicate antitrust laws).

8. *See* William N. Eskridge, Jr., The New Textualism, 37 UCLA L.Rev. 621 (1990) (outlining Justice Scalia's theory of statutory interpretation).

9. Professor Elhauge, of counsel to VVL in this case, argues that the Sherman Antitrust Act was not intended to govern financially disinterested restraints that are not commercial in nature. The Scope of Antitrust Process, 104 Harv. L.Rev. 668, 738–46 (1991).

Herbert Hovenkamp, Antitrust's Protected Classes, 88 Mich. L.Rev. 1, 21–24 (1989) (same); *Scheidler,* 968 F.2d at 621. The central evil that the Act sought to conquer was the combination of corporate giants or trusts, conspiring to hinder competition in order to raise prices and reap supracompetitive profits to the detriment of consumers (and competition).[10] *See* 1 Earl W. Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes (1978) (quoting legislative debates); *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 709 n. 7, 3 L.Ed.2d 741 (1959) ("The [Supreme Court has] ... recognized that the Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations ... which have other objectives."); *Apex Hosiery,* 310 U.S. at 493, 60 S.Ct. at 992 (same). Despite their apparent distance from "Big Business," nonprofit organizations have been brought within the scope of the Act.[11] *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (invalidating minimum fee schedule for legal services published by nonprofit professional organization). Nonprofit organizations, however, have been awarded a limited immunity from antitrust liability: if their activities are "noncommercial," nonprofit organizations can escape the reach of the Act. *Compare United States v. Brown University,* 5 F.3d 658, 665–66 (3d Cir.1993) (holding that Section 1 of the Act applies to a group of universities that agree to abide by common rules governing disbursement of financial aid with departure from rules punishable by sanctions) (citing *Goldfarb,* 421 U.S. at 787–88, 95 S.Ct. at 2013–14), with *Scheidler,* 968 F.2d at 617–23 (holding that "organizations espousing social causes," such as violent anti-

abortion protestors, fell beyond the scope of the Act), and *Missouri v. National Organization for Women ["NOW"],* 620 F.2d 1301, 1304–05 (8th Cir.1980) (holding that NOW's boycott against all states that had failed to ratify the Equal Rights Amendment could not be redressed by the Sherman Antitrust Act, despite the boycott's economic impact). "Benign" intent (e.g., concern for public welfare) alone will not excuse a nonprofit organization engaged in commercial activity from entering into an otherwise illicit agreement. *See, e.g., FTC v. Superior Court Trial Lawyers,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (rejecting claim that challenged agreement was necessary to induce better lawyers to represent indigents); *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 463, 106 S.Ct. 2009, 2020, 90 L.Ed.2d 445 (1986) (rejecting claim that challenged agreement was necessary for quality dental care); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 695, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978) (rejecting claim that challenged agreement was necessary to insure public safety). But the Act does not control the conduct of an eleemosynary organization pursuing primarily political or social objectives, from which it does not receive pecuniary gain. *See* Herbert Hovenkamp, Federal Antitrust Policy § 5.4e (1994) [hereinafter Hovenkamp, Antitrust Policy]; Herbert Hovenkamp, Economics and Federal Antitrust Law § 10.2 (1985) [hereinafter Hovenkamp, Antitrust Law].

Aside from sound policy considerations suggesting the wisdom of carving out a special exception for nonprofit organizations engaged in noncommercial transactions, the exemption finds support in the legislative history of the Act and subsequent case law. As the courts in *Missouri v. NOW* and

---

**10.** Included among the practices viewed by the Supreme Court as most dangerous are the following: *horizontal and vertical price-fixing,* certain tying arrangements, group boycotts or concerted refusals to deal, and horizontal market divisions. *See* 2 Julian Von Kalinowski, Antitrust Laws & Trade Regulation § 6.02[1] (1984); *see also Apex Hosiery Co. v. Leader,* 310 U.S. 469, 497, 60 S.Ct. 982, 994, 84 L.Ed. 1311 (1940) (citing practices).

**11.** Although it is beyond cavil that nonprofit organizations are subject to federal antitrust laws,

*see American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 576, 102 S.Ct. 1935, 1947–48, 72 L.Ed.2d 330 (1982), the Supreme Court has flinched, if only in dictum, at the prospect of exposing nonprofit organizations to the same liability faced by for-profit businesses. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 778–89 n. 17, 95 S.Ct. 2004, 2008–14 n. 17, 44 L.Ed.2d 572 (1975); *but see National Society of Professional Engineers v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1367–68, 55 L.Ed.2d 637 (1978) (flinching from the flinch).

*Scheidler* have detailed, the only congressional debates addressing the issue indicate that the Act was not intended to govern activities by noncommercial entities with noncommercial objectives. In the late 1800s, liquor saloons were the focus of the same type of vitriolic attack to which abortion clinics have fallen prey today. *See Scheidler*, 968 F.2d at 618–20 (citing legislative history and historical sources and describing the remarkable similarities between the invasions suffered by abortion clinics and liquor saloons). Participants in the temperance movement often employed violent tactics to drive establishments legally serving alcohol out of business. *Id.* Reduction (by destruction) of liquor supply was one method used to achieve their goal. *Id.* An important opponent of the Act, Senator George, worried that the antitrust laws would be brought to bear against "purely moral and defensive" agreements; he criticized the Act for potentially bringing "within [its] terms ... any number of persons belonging to or joining a temperance society whose object [was] to compel retailers of intoxicating liquors to give up their business." 1 Kintner, *supra*, at 77–79 (quoting 20 Cong. Rec. 1458–59 (1889)). Responding to speculation that concerted agreement to destroy the liquor business could possibly fall within the Act, Senator Sherman (the Act's sponsor), stated as follows:

> ... I do not see any reason for [including within the Act's reach] temperance societies any more than churches or school-houses or any other kind of moral or educational associations that may be organized. Such an association is not in any sense a combination or arrangement made to interfere with interstate commerce. ... You might as well include churches and Sunday schools.

*Id.* at 250–52 (quoting 21 Cong. Rec. 2658–59 (1890)).

Relying upon this legislative history, the court in *Scheidler* concluded that the Act "was intended to prevent business competitors from making restraining arrangements for their own economic advantage." 968 F.2d at 621. But "an industry faced with violent opposition from some segment of the public" could not seek refuge in the antitrust laws. *Id.* at 622. For instance, the Seventh Circuit rejected the possibility that Earth First!, an environmental group that vandalizes equipment belonging to nuclear power and logging companies, could be sued by its victims for antitrust violations. *Id.* Thus, the court in *Scheidler* held that the furious, concerted attacks staged by anti-abortion groups against abortion clinics were not governed by Section 1 even if these groups "rais[ed] prices [of abortions] by increasing costs [to abortion clinics]." *Id.* at 623. In a footnote, the court indicated that competitors would be subject to the antitrust laws for like conduct. *Id.* at 623 n. 13.

Turning to more halcyon times, the court in *Marjorie Webster Jr. College v. Middle States Association of Colleges and Secondary Schools*, 432 F.2d 650 (D.C.Cir.1970), dispensed quickly with arguments that federal antitrust laws barred the decision of a nonprofit educational association to deny accreditation to a proprietary junior college because, pursuant to its policy, accreditation was extended only to nonprofit institutions. The Sherman Antitrust Act, the court explained, was not "tailored ... for the non-commercial aspects of the liberal arts and the learned professions." 432 F.2d at 654 (internal quotations, citations, and footnotes omitted). In contrast to a situation where "accreditation [was] denied any institution purchasing textbooks from a supplier who did not provide special discounts for association members," *id.* at 655 n. 21, the defendant was not compensated (monetarily) for its accreditation services; the defendant's objectives were thus noncommercial and not actionable under the Sherman Antitrust Act despite "an incidental restraint on trade," *id.* at 654, i.e., a setback to proprietary colleges in their efforts to recruit students.

The Ninth Circuit appeared rather insulted at the suggestion by one nonprofit animal shelter society, Dedication and Everlasting Love to Animals ("DELTA"), that another similar organization, Humane Society of the United States ("Humane Society"), was guilty of violating the antitrust laws through its solicitation of donations. *DELTA v. Humane Society of the United States, Inc.*, 50

F.3d 710 (9th Cir.1995) (alleging violations of Sections 1 and 2 of the Sherman Antitrust Act). Comparing the case to a hypothetical where " 'two philanthropists ... 'divide the market' by agreeing that one would care for the homeless on the east side of town while the other did so on the west side,' " the Ninth Circuit rejected the notion that a charitable organization "competing" with another in the "market" for public contributions could be brought within the scope of the antitrust laws. *Id.* at 714 (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 232.2 (1989 & Supp.1993)). This was simply not "commerce" within the meaning of the Sherman Antitrust Act, the Ninth Circuit concluded, and the gain derived by the Humane Society "[f]rom its donations, ... [in the form of] reputation, prestige, [and] money for its officers" did not transform its fundraising, even if "self-serving," into a commercial transaction. 50 F.3d at 714.

These cases and the Act's legislative history suggest that to the extent the Act "sets up a code of ethics," *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 140, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961), the code does not govern the country; it governs commerce. The purpose of the Act is to ensure that competition reigns supreme in the business world. But the Sherman Antitrust Act makes no value judgment that competition in the business world should be elevated over pursuit of noncommercial social or political objectives by noncommercial social or political organizations.

### 2. LEGAL STANDARD GOVERNING NONPROFITS AS IT APPLIES TO HGSI

Having laid out what the court believes to be controlling law, it will now consider whether VVL can sue HGSI under Section 1.

The following facts are drawn from VVL's complaint. Although VVL has alleged that HGSI is motivated by the desire to protect its land values from plummeting, the complaint makes clear that concern with proper-

ty values is tangential to HGSI's primary objective. HGSI, first and foremost, concerns itself with preserving national landmarks, mainly for (nonpecuniary) aesthetic, historic, and environmental reasons. HGSI has never been interested in mining or selling vermiculite for profit; it is uninterested in profiting from the purchase or sale of vermiculite mining rights. To be sure, HGSI has a stake in the market for vermiculite and vermiculite mining rights. HGSI wishes to restrict the production of vermiculite and it hopes to acquire vermiculite mining rights. But HGSI does not desire to suppress supply and dominate the vermiculite mining rights market in the same way that a for-profit corporation competing for vermiculite or vermiculite mining rights would. The goal of HGSI and a hypothetical competitor are alike only in the most superficial way. Whereas the latter strives to achieve the goal for business purposes—to raise price and to increase its profits—HGSI makes no profit from its acquisition of vermiculite mining rights and is indifferent to the going price of vermiculite concentrates. This is not to say that HGSI's efforts to suppress the supply of vermiculite (or vermiculite mining rights) cannot detrimentally affect competition. Ignoring for the moment potential substitutes for vermiculite (as well as other relevant characteristics of the market), it can be readily assumed, at this stage of the analysis, that a constriction of a finite supply of vermiculite may drive up the price of that resource. The same can be said for vermiculite mining rights. But the Sherman Antitrust Act does not redress all anticompetitive effects; little doubt exists that attacks perpetrated upon liquor saloons and abortion clinics had an unhealthy impact on competition as well, but neither Congress nor the Seventh Circuit believed that this anticompetitive effect should lead to antitrust liability.

■ If one overlooks the surface differences, HGSI fits comfortably into the mold of the anti-abortion agitators and the temperance activists.[12] All wish to extinguish a class of producers: those dealing in abor-

---

12. By no means should this statement be taken to suggest that HGSI's conduct is morally com-

parable to the vicious acts of these groups.

tions, liquor, and vermiculite. *See Scheidler,* 968 F.2d at 622 (emphasizing that the anti-abortion protestors targeted *all* abortion clinics). None profit financially from reducing the supply and increasing the price of their targets—their goal—achieved by a sustained campaign against, as the case may be, abortionists, saloonists, or vermiculite producers. None is alleged to have market power (i.e., "the ability to ... increase ... profits by reducing output and charging more than a competitive price," Hovenkamp, *supra,* Antitrust Law § 3.1).[13] The objective of each is properly classified as political or social. Accordingly, the court finds that, like the participants in the temperance movement and anti-abortion movement, HGSI is not engaged in commercial activities and should not be exposed to antitrust liability.

### 3. VVL'S OPPOSING ARGUMENTS

■ VVL makes sundry arguments, many of which are certainly accurate, but nonetheless do not help its cause. Initially, VVL emphasizes that nonprofit organizations are entitled to no blanket exemption from the Sherman Antitrust Act. The court readily agrees. Next, VVL contends that HGSI's "good" intentions will not shield it from liability under Section 1. This too is true, but incomplete. Although "malign," anticompetitive intent is not a prerequisite to a Section 1 claim, intent or objective is relevant in determining whether a nonprofit organization's activities are commercial in nature. *Marjorie Webster,* 432 F.2d at 654 (emphasizing the noncommercial objectives of the nonprofit educational association accused of violating antitrust laws, but noting that lack of predatory intent will not save an activity that otherwise falls within the scope of the Act); *Association for Intercollegiate Athletics for Women v. N.C.A.A.,* 735 F.2d 577, 584 n. 8 (D.C.Cir. 1984) (per curiam) ("We acknowledge that some practices by non-profit organizations may produce anticompetitive effects but still be essential to the organization's achieving its legitimate noncommercial objectives. In such case, we do not foreclose the possibility that achieving the essential noncommercial

objective may justify some anticompetitive impact.") (citations omitted). As discussed above, the facts alleged in VVL's complaint do not permit the court to arrive at any conclusion but that HGSI's objectives are noncommercial.

Citing *Brown,* 5 F.3d at 668, VVL urges that nonprofit organizations, regardless of the aspirations expressed in their charters, are capable of trafficking in commerce. Nothing in *Brown* is inconsistent with the court's discussion here. Contrasting its case from *Marjorie Webster,* where accreditation brought the defendant no monetary gain, the court in *Brown* held that a university does not merely engage in charity when it "discount[s] the price of educational services for needy students ... [in exchange for] tangible benefits." *Id.* at 666. After it determined that financial aid constituted a part of the tuition price, the court found that the defendant university "immuniz[ed] itself ... from competition" in abiding by an agreement with other universities to disburse financial aid only on the basis of need. *Id.* Such circumstances are missing from this case. Like the defendant in *Marjorie Webster,* HGSI does not derive pecuniary gain from suppressing vermiculite mining; to the extent that its land values are enhanced by a cessation of mining, this benefit is merely incidental to its overriding goal of preserving land for nonpecuniary reasons. Secondary benefits such as this redound to most, if not all, charitable organizations and quintessentially noncommercial institutions. Marriage entered into for love may yield far more concrete treasures.[14] Accepting the presence of such benefits as evidence of commercial activity would easily bring virtually any transaction within the scope of the Sherman Antitrust Act. *See DELTA,* 50 F.3d at 714 (noting that self-serving efforts to enhance reputation, prestige, and remuneration to officers do not necessarily qualify an activity as commercial in nature). This is exactly the result the court wishes to avoid.

The only argument left to VVL boils down to the truism that this case is of first impres-

---

**13.** VVL abandoned, in its Second Amended Complaint, the claim that HGSI has market power in the vermiculite mining rights market.

**14.** *See infra* note 17.

sion. VVL remarks that none of the cases upon which HGSI relies involve an allegation that a nonprofit organization conspired with a business competitor. VVL is correct; the unique circumstances in this case, to this court's knowledge never encountered by any other court, force one to reason by analogy.[15]

■ At first blush, VVL's insistence that the presence of a business competitor, Grace, allegedly acting in concert with HGSI, distinguishes this case from *Scheidler* (and, by implication, the temperance movement) seems persuasive. A second glance, however, casts doubt on the importance of Grace's involvement. VVL's argument leads the court to the following hypotheticals. If the participants in the temperance movement, instead of hammering away at liquor saloons, accepted donated saloons on the condition that liquor would never again be served on their premises, would this violate Section 1? Alternatively, if the anti-abortion protestors renounced assaults upon abortion clinics, and instead accepted donated clinics with the agreement that abortions would never be performed on their premises, would this violate the antitrust laws? If the answer to these questions were yes, the message to

HGSI would surely be that it transform itself into a version of Earth First! and strive toward its preservation goals with more (physical) vigor. Competition would not be advanced by such a perverse incentive.[16]

On the other hand, if HGSI did not succumb to violence to avoid an antitrust lawsuit, it would have few options available to it in furthering its goal of halting vermiculite mining. Politely badgering the producers of vermiculite, if effective, would be dangerous—a disgruntled competitor could petition a court of law for relief. And yet, as VVL concedes, HGSI's desire to preserve land (for the sake of beauty, history, and environment) is a legitimate social objective. As has been emphasized by two somewhat different commentators, the Ninth Circuit and author David Foster Wallace, "[n]ot every aspect of life in the United States is to be reduced to ... a single-minded vision of the ubiquity of commerce." *DELTA*, 50 F.3d at 714 (expressing disturbance at the prospect of federal antitrust laws that impinge upon "everything from ... church fair[s] to ... solicitation of voluntary blood donors ... [to] engagement[s] or marriage[s]").[17] On a more entertaining

---

**15.** VVL cites *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 810, 65 S.Ct. 1533, 1540, 89 L.Ed. 1939 (1945), and *United States v. Borden Co.*, 308 U.S. 188, 204–05, 60 S.Ct. 182, 191, 84 L.Ed. 181 (1939), for the proposition that even if HGSI were entitled to an exemption from antitrust liability, its exemption would be forfeited because of its alleged conspiracy with Grace, its competitor. In *Borden* and in *Allen*, however, there was no question that the defendants were engaging in commercial transactions. The agricultural producers in *Borden* received pecuniary benefit by entering into an agreement to extract supracompetitive prices for milk, and the labor unions in *Allen* conspired with other groups in order to win higher wages. In contrast, HGSI's primary objective is not to achieve pecuniary gain, and, consistent with its objective, HGSI's gain from its agreement is largely nonpecuniary.

**16.** Of course, what one can legally achieve unilaterally, one cannot necessarily achieve in concert with another under Section 1. *See, e.g., Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). This principle, however, is not at issue here; rather, the issue is whether the identity of the alleged conspirator (in *Scheidler*, other anti-abortionists; in this case, Grace) is dispositive.

**17.** Although the Ninth Circuit's invocation of engagement and marriage seems far-fetched, some do not view romance as something far-removed from the business world. *See* Saul Levmore, Love it or Leave it: Property Rules, Liability Rules, and Exclusivity of Remedies in Partnership and Marriage, 58 Law & Contemp. Probs. 221, 228 (1995) (comparing "the traditional [business] partnership rule" to "the law governing marriages," both of which "promise[ ] liquidity by offering every participant the right to exit with the net value of that participant's share in the enterprise, but ... [with] no other [available] remedy"); Saul Levmore, Irreversibility and the Law: The Size of Firms and Other Organizations, 18 J. Corp. Law 333, 356 (1993) (describing the problem of irreversibility—undesirable expansion that may be difficult to undo—in the corporate context and analogizing to the familial sphere, where the problem is the flip side of irreversibility, because "[i]n the family setting, 'agents' may have a propensity to quit, or contract selfishly, when things are difficult").

Perhaps the laws against polygamy should be characterized as government imposed rationing; whereas in the business world, the individual with the most money can purchase an amount of goods limited only by his preferences and his purchasing power, in the market for marriages,

note, David Foster Wallace, in his novel *Infinite Jest*, envisions a mad commercialization of America, leading to "ecological gerrymandering" and an unwelcome donation of our fatally-polluted Northeastern states (the "toxically convex addition") to Canada.[18] The court is convinced that the Sherman Antitrust Act neither intended to invade the sphere of courtships and picnics nor to prevent organizations such as HGSI from battling against a perceived dysutopia where America is ecologically .gerrymandered and Canada is compelled to receive America's unwanted toxically convex addition. Again, the core purpose of the Act is "to protect consumers from monopoly prices, and not to serve as a comprehensive code to regulate and police all kinds and types of interruptions and obstructions to the flow of trade." *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945). Consequently, the court holds that, on the facts of this case, the Sherman Antitrust Act does not apply to HGSI.

## 4. EXISTENCE OF AGREEMENT BETWEEN HGSI AND GRACE

█ VVL urges that even if "HGSI's motives ... excuse it from liability, they would not excuse Grace." VVL's Objections of October 2, 1995 (citing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)). VVL's premise is mistaken: HGSI's *motives* do not excuse HGSI from liability; the nature of the transaction, elucidated by an examination of motives, removes HGSI from the reach of the Sherman Antitrust Act. Nonetheless, the court agrees that simply because HGSI cannot be held liable under Section 1 does not mean that Grace too escapes liability. Section 1 liability only attaches to concerted action, which requires "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

Graces takes the position that this definition requires anticompetitive intent or an overlap in motives between the conspiring parties.

Given the present state of the law, the court cannot accept Grace's argument that anticompetitive intent or similar objectives on the part of both parties must exist before a conspiracy can be formed under Section 1. To demonstrate the point with a dramatic case, the Supreme Court has speculated in heretofore dormant dictum that a carrier who lost customers to a lower-priced competing carrier could allege that a conspiracy within the meaning of Section 1 existed between the newspaper which hired the competing carrier and the lost customers. *See Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968). One need not go this far; indeed, one ought not, for neither lower courts nor the Supreme Court have been faithful to *Albrecht*'s extreme. Other case law, relying upon more commonly invoked principles than potential consumer liability, makes plain, albeit with less pungency than *Albrecht*'s infamous dictum, that no overlap in motive is required. For instance, in *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir.1987) (Posner, J.), the plaintiff, a dealer, claimed that the defendant, a supplier, had forced him, with threats and harassment, to raise retail prices on the stoves he sold. Judge Posner, speaking for the Seventh Circuit, observed that "[t]he fact that [an antitrust plaintiff] may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of [S]ection 1." *Id.* at 1163 (citing *Albrecht* and *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)). Of course, in yielding to the supplier, the dealer's motive was neither anticompetitive nor the same as that of the supplier; rather, he wished only to avoid the harassment and threats to which he had been subject.

Grace is led astray by the language in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775

the individual with the most "purchasing power," in terms of attractiveness and charisma, cannot "buy" all that she is willing and able without running up against the law.

**18.** For a brilliant commentary, see David Foster Wallace, *Infinite Jest* 398407 (1996).

(1984), emphasizing the need for " 'a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980)). *Monsanto* dealt only with the question of how much proof must be adduced to show concerted (as opposed to unilateral) action; the Supreme Court held that "an antitrust plaintiff ... [must do more than] show [ ] that a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors [to establish agreement within the meaning of Section 1]." 465 U.S. at 759, 104 S.Ct. at 1468. The language upon which Grace relies focuses on commonality and conscious agreement mainly to ensure that two independent actors—the manufacturer and the distributor—do not get ensnared in Section 1 liability simply because there is some slight evidence that their acts are connected or because a manufacturer announces a policy and the distributor complies (*see United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). *Monsanto* does not purport to adjudicate the issues of the parties' intent, other than to assure that they have agreed to a certain course of conduct.

▉ In this case, there is no issue of proof; this is a Rule 12(b)(6) motion, and VVL has adequately alleged an agreement within the meaning of Section 1 between HGSI and Grace. This agreement is embodied in the restrictive covenants or the alleged implied agreement entered into by HGSI and Grace, in which they decide that there will be no mining on the conveyed properties. That HGSI had no anticompetitive intent or commercial objective does not factor into the analysis. Therefore Grace cannot "free ride" on HGSI's defense to avoid Section 1 liability. Even so, Grace has another defense available to it, by which it can escape Section 1.

## B. ANTITRUST INJURY AND THE REQUIREMENT OF PROXIMATE CAUSE

### 1. LEGAL STANDARD UNDER SECTION 1

▉ To establish a violation under Section 1 of the Sherman Antitrust Act, an antitrust plaintiff must demonstrate that (1) at least two persons entered into an agreement, and (2) the agreement unreasonably restrains trade. *Miller & Smith,* 14 F.3d at 220 (citing *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 702 (4th Cir.1991)). Ultimately, the plaintiff must show " 'that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market.' " *Advanced Health–Care Serv. v. Radford Community Hospital,* 910 F.2d 139, 144 (4th Cir.1990) (quoting *Terry's Floor Fashions v. Burlington Indus.,* 763 F.2d 604, 610 n. 10 (4th Cir.1985)). Sections 4 [19] and 16 [20] of the Clayton Act, 15 U.S.C. § 15 (providing for treble damages), § 26 (providing for injunctive relief) confer standing upon a private party to enforce the antitrust laws. As a prerequisite to suit, a private party, such as VVL, must establish actual or threatened "antitrust injury," the former under Section 4, and the latter under Section 16. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111, 113, 107 S.Ct. 484, 489–90, 491, 93 L.Ed.2d 427 (1986) (holding that the "antitrust injury" requirement applies to Section 16 as well as Section 4 claims). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. "To establish an antitrust injury, a plaintiff must show not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was [or will be] 'the cause-in-fact of the injury: that 'but for' the violation, the injury would not [or will not] have occurred.' " *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.,* 36 F.3d 565, 573 (7th Cir.

---

**19.** "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor, ... and shall recover threefold the damages by him sustained...." 15 U.S.C. § 15(a).

**20.** "Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26.

1994) (quoting *Greater Rockford Energy & Technology v. Shell Oil,* 998 F.2d 391, 394–96 (7th Cir.1993)); *see Advance Health–Care,* 910 F.2d at 149 ("[A] plaintiff must show a reasonably probable causal link between the antitrust violation and a business loss of the sort the antitrust laws were designed to prevent.") (citing, inter alia; *Cargill* ).

In *Martin Marietta,* the plaintiff and the defendant, competing sand and gravel companies, entered into an agreement establishing the defendant as the exclusive sand sales agent for the plaintiff. Suspecting that the defendant was selling its sand at unauthorized discounts, the plaintiff terminated the agreement with the defendant and, some months later, contracted with another company to sell its sand. Subsequently, the plaintiff brought suit, and the defendant counterclaimed, alleging that the plaintiff's agreement with the other company violated antitrust laws. The Seventh Circuit held that the defendant had failed to satisfy the causation requirement, because there had been no showing that any injury to the defendant (termination of the agreement between itself and the plaintiff) had been caused by the plaintiff's new agreement. 36 F.3d at 573–74 (stating that there must be showing that " 'violation was a material element of, and substantial factor in, producing the injury' ") (quoting *Greater Rockford Energy,* 998 F.2d at 401). Without showing proximate cause, the defendant could not proceed on its claims, even if the challenged agreement was violative of the Sherman Antitrust Act. 36 F.3d at 572–74.

## 2. REQUIREMENT OF PROXIMATE CAUSE APPLIED TO VVL'S ALLEGED INJURY

■ The court is mindful that, unlike in *Martin Marietta,* the force of Rule 12(b)(6) tips the balance strongly in favor of VVL. Nevertheless, the court believes that even under the lenient standard dictated by Rule 12(b)(6), VVL cannot proceed on its Section 1 claim against Grace and HGSI because its complaint contains no allegation that without the allegedly illegal restraint, injury to VVL would have been avoided. Worse yet (for VVL), everything in its complaint points to the opposite conclusion: that the alleged restraint was entirely superfluous. It must not be forgotten that the alleged restraint under attack is not the mere donation from Grace to HGSI;[21] rather, the restraint that VVL claims violates Section 1 is the agreement that the conveyances comprising the donation never be mined for vermiculite. The restrictive covenants most baldly illustrate the alleged restraint, but the alleged implicit agreement never to permit vermiculite mining also qualifies.

The incurable defect in VVL's complaint comes from a glaring omission: nowhere does VVL allege, nor could it, that "but for" the express or implied agreement between Grace and HGSI, HGSI or its successor would otherwise allow vermiculite mining. As Grace succinctly stated during oral argument, VVL does not even allege such a probability or a slim possibility. Transcript of January 31, 1997 Hearing at 41–43. Perhaps the absence of this allegation could be forgiven in a different complaint; but certain allegations in VVL's complaint so sharply contradict any scenario in which HGSI—if only freed of the agreement with Grace—would permit vermiculite mining that there can be no colorable claim that the agreement with Grace has any effect on HGSI's position against vermiculite mining. As counsel for VVL lamented during oral argument, "[VVL] can't contradict [its] own allegations [in its complaint]." *Id.* at 17. The court can understand counsel's chagrin, for to state a claim under Section 1, VVL would have to abandon the facts pled in the complaint. VVL explains that "[s]ince the early 1970's, one of HGSI's avowed goals has been and continues to be to eliminate all vermiculite mining throughout Louisa County.... For over 20 years, HGSI conducted a campaign to obtain from Grace all of its mining rights and other property interests in Louisa County." Second Amended Complaint ¶¶ 36, 37. This set of facts cannot be squared with the contention (not made in VVL's complaint)

---

**21.** The donation itself, stripped of any explicit or implicit understanding against mining, could not violate Section 1, because, absent the understanding between Grace and HGSI, there would be no concerted action alleged to have unreasonably restrained trade.

that without an implicit or explicit agreement burdening HGSI, it would entertain suggestions that vermiculite mining be commenced on the donated conveyances. HGSI, according to the complaint, has held an unwavering commitment to halt all vermiculite mining for over two decades; VVL's complaint leaves no room for an inference that this commitment is brought about by, or even affected by, an agreement with Grace, for the agreement did nothing more than secure a promise from HGSI to keep doing what it intended all along to do. One does not extract a concession from a caged bird, freed only on the condition that it will fly away when the door swings open.

VVL's counsel weakly argues that "if HGSI were to believe that mining could be conducted in a way ... that would be consistent with historic preservation ... [because of reclamation, it is] not going to be able to allow that [because of the agreement with Grace]." Transcript of January 31, 1997 Hearing at 17–18. Counsel forgets that he has already conceded that this "is not HGSI's position today ... [and that he] understand[s] it hasn't been [HGSI's] position for the last 20 years." *Id.* at 17. Nor does anything in VVL's complaint foreshadow a change. The case law instructs that "a complaint should not be dismissed 'merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted.'" *Advance Health–Care,* 910 F.2d at 145 n. 8 (quoting *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982)). If VVL proves the facts stated in its complaint, it could not prevail, because the court concludes that, as a matter of law, the facts demonstrate that the allegedly unreasonable restraint on trade is not the proximate cause of any threatened or actual injury to VVL. Consequently, all Section 1 claims against Grace (and HGSI) must be dismissed on this ground alone.[22]

## VI. SECTION 2 CLAIMS

■ Though this is bound to be of little consolation to Grace, the court is persuaded that economic reality probably supports its position with respect to the Section 2 claims against it. Nonetheless, the posture of this case prevents the court from taking up Grace's invitation to look past the allegations in VVL's complaint. With the arguments Grace offers the court, it essentially hopes to make the court forget that this is a Rule 12(b)(6) motion (time is surely on Grace's side); Grace's arguments are of the sort that can only succeed forty-four rules down the line (on a motion for summary judgment pursuant to Fed.R.Civ.P. 56). The court repeats the admonition from the Fourth Circuit: conviction by the court that the plaintiff will not succeed on his claim does not justify dismissal under Rule 12(b)(6) when the plaintiff has colorably stated the allegations necessary to his cause of action. *Advance Health–Care,* 910 F.2d at 145 n. 8 (quoting *Bain,* 697 F.2d at 1216). Further, the court notes that it is not at liberty at this stage of the analysis quietly to overlook certain Supreme Court precedent of arguably dubious economic validity (as various appellate courts have done at subsequent stages of litigation). *See Advance Health–Care,* 910 F.2d at 148 n. 16; *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379 (7th Cir.1986) (Posner, J.).

### A. LEGAL STANDARD UNDER SECTION 2

■ Section 2 of the Sherman Antitrust Act prohibits any "person ... from monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2. Under Section 2, unlike Section 1, unilateral conduct is actionable. VVL charges Grace with monopolization, attempted monopolization, and conspiring to monopolize; HGSI stands accused only of conspiring to monopolize.

■ To state a claim of monopolization, a private antitrust plaintiff must allege "possession of monopoly power in the relevant market," "willful acquisition or maintenance of that power as distinguished from growth

---

22. Because of this conclusion, the court need not reach the question whether the Peers (neither competitors nor consumers) have standing to pursue Section 1 claims against Grace.

or development as a consequence of a superior product, business acumen, or historic accident," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)), and causal antitrust injury. *Advanced Health–Care*, 910 F.2d at 147.

■ To state a claim of attempted monopolization, the plaintiff must allege "a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization." *Id.*

■ To state a claim of conspiracy to monopolize the plaintiff must allege a conspiracy, an overt act committed in furtherance of the conspiracy, a substantial effect on commerce, and specific intent to monopolize. *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

## B.  ARGUMENTS OF GRACE AND HGSI

With respect to the monopolization claim, Grace makes the following arguments in support of its motion to dismiss. First, Grace maintains that its market share cannot support a finding of market power because its share is too small and, at that, declining. Second, Grace insists that it had no duty to sell its holdings to VVL and therefore cannot be guilty of a Section 2 violation for failing to do so. Third, Grace offers that its legitimate business reason—a considerable tax deduction—relieves it from any supposed duty it had to deal with VVL. Fourth, Grace disputes the presence of causal antitrust injury. In opposing the attempted monopolization claim, Grace adds the argument that its offer to sell the donated properties to VVL negates anticompetitive intent. Addressing the conspiracy to monopolize claim, Grace repeats the argument it made on the Section 1 claim against it: HGSI and Grace did not share a common intent and consequently did not agree within the meaning of Section 2. Finally, Grace contends that laches bars VVL from requesting divestiture of the transferred properties. HGSI continues to rely on its previous argument: that, as a nonprofit organization whose activities are noncommercial, it is not subject to the antitrust laws.

Although it challenges all other elements, Grace appears to concede, and the court finds, that VVL has sufficiently alleged an overt act (for the conspiracy to monopolize claim) and a substantial effect on commerce (for the conspiracy to monopolize claim).

## C.  ECONOMIC BACKGROUND

To address defendants' arguments, a brief overview of economics is in order. For a Section 2 claim, two concepts must be understood: market or monopoly power and relevant market. As discussed above, market power is "the ability to … increase … profits by reducing output and charging more than a competitive price." Hovenkamp, *supra*, Antitrust Law § 3.1. Monopoly power is a high dosage of market power. *Id.* § 5.2. Although various factors are important in determining whether a firm has monopoly power (such as entry barriers, economies of scale, concentration), often the analysis turns on market share—generally, the higher the market share the easier is the plaintiffs case. *Id.* Usually, courts require a threshold showing of 60–70% before they will infer monopoly power from market share. *See* William M. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 Harv. L.Rev. 937, 951 (1981) (discussing the role of elasticity of demand—responsiveness of quantity demanded to a one percentage change in price—and elasticity of supply—responsiveness of quantity supplied to a one percentage change in price). Depending on other factors, however, a market share as low as 40% might suffice. *Id.* (explaining that when demand and supply for a product are highly inelastic, a firm with only a 40% market share might be able profitably to charge double the competitive price).

"A relevant market [or the relevant geographic and product market] is the smallest market for which the elasticity of demand and supply are sufficiently low that a firm with 100% of that market could profitably reduce output and increase its price substan-

tially." Hovenkamp, *supra,* Antitrust Law § 3.2. To understand the definition without the economist's jargon, imagine a Virginia producer of pickled watermelon which reduces output, raises price, and manages to reap a profit. If no producer from outside Virginia, lured by the supracompetitive price, provides consumers with out-of-state pickled watermelon, and no consumers, responding to the price increase, rush outside Virginia to obtain their delicacy, a relevant "geographic market" has been established. If no consumers switch from pickled watermelon to a comparable delicacy, such as pickled peaches, and no producers abandon production of a comparable good in favor of pickled watermelon, a relevant "product market" has been established.

### D. SECTION 2 LAW AND ECONOMICS APPLIED TO THIS CASE

#### 1. MARKET SHARE IN THE RELEVANT MARKET

■ Grace admits—wisely so—that for purposes of Rule 12(b)(6) it is stuck with VVL's definition of product market (vermiculite concentrates), which disregards the existence of possibly close or virtually interchangeable substitutes for vermiculite concentrates. Similarly, under the strictures of 12(b)(6) Grace cannot contest VVL's assertion that foreign producers of vermiculite are nonresponsive to price fluctuations in the United States (the geographic market).[23] Given these facts, it is at least plausible to assume that demand for vermiculite is largely inelastic (because consumers need vermiculite and there are no good substitutes) and that elasticity of supply is also low (because foreign producers are nonresponsive to price increases and domestic producers cannot shift production toward vermiculite, which is essentially unavailable to them). Under this scenario, the quantity demanded by custom-

ers remains such that when output is reduced and price is increased (to a supracompetitive level), Grace profits and no would-be competitors step in to drive down price. Given these circumstances, Landes and Posner teach that Grace's market share-alleged to be 57% in 1992—suffices to permit an exercise of monopoly power. Although Grace argues that its market share has declined, VVL's complaint does not reveal the percentage drop; nothing in the complaint allows the court to determine to a certainty that Grace's market share has fallen so low that, as a matter of law, VVL cannot prevail on its complaint.[24] Moreover, VVL finds itself in good company when it argues that a decline in market share does not automatically defeat a finding of monopoly power: "A decline in market share might indicate that market power exists and is being exercised." Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law ¶ 835.2a (1995).

Although academics and courts often disagree, the great weight of precedent is consistent with this conclusion and the conclusion reached by Professor Landes and (now) Judge Posner. *See, e.g., United States v. Columbia Steel Co.,* 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) (declining "to prescribe any set percentage of figures" because "the relative effect of percentage command of a market varies with the setting in which that factor is placed"); *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 201–02 (3d Cir.1992) ("A predominant share of the market, or a lesser market share, *combined with other relevant factors,* may suffice to demonstrate monopoly power.") (emphasis added and citations omitted); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 367 (9th Cir.1988) (indicating that it cannot be inferred as a

---

**23.** In its April 21, 1995 Opposition to Defendants' Motion to Dismiss, VVL disavows any claim that its complaint alleges that Grace has violated Section 2 by monopolizing or attempting to monopolize the "vermiculite mining rights market" in Louisa County or South Carolina. *Id.* at 7 n. 1. VVL alleges monopolization in the "vermiculite concentrates market." *Id.* Although this disavowal was made before VVL twice amended its complaint, nothing in its subsequent

complaints indicates any intention to renounce this position. Therefore, the court confines its discussion to the United States vermiculite concentrates market.

**24.** From the allegations in the complaint, it can be deduced that VVL owns 20% of vermiculite mining rights in the United States, HGSI owns 40%, and Grace owns 40%.

matter of law that an antitrust defendant lacks monopoly power simply because of decline in his market share); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 (5th Cir.1984) ("Supreme Court cases, as well as cases from this court, suggest that *absent special circumstances,* a defendant must have a market share of at least fifty percent before he can be guilty of monopolization.") (emphasis added and footnote omitted); *Broadway Delivery Corp. v. United Parcel Service, Inc.,* 651 F.2d 122, 126–30 (2d Cir.1981) (Newman, J.) (concluding that it was error for the district court to instruct jury that a finding of less than 50% of market share precluded finding of monopoly power because "the true significance of market share data can be determined only after careful analysis of the particular type of market"); *Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1352 & n. 18 (5th Cir.1980) (suggesting that approximately 50% might suffice with low number of competitors and high entry barriers); *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980) ("Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition.").

Thus, insofar as Grace argues that a market share of 51–57% [25] precludes an inference of monopoly as a matter of law, Grace is mistaken. The cases cited by Grace are of little help, for none involve Rule 12(b)(6) dismissals. At a possible summary judgment phase, Grace may well prevail on its argument; many courts ultimately find 50–60% to be insufficient. *See, e.g., Fineman,* 980 F.2d at 201–02 ("A significantly larger share than 55 percent has been required to demonstrate *prima facie* monopoly power."); *White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974) (stating that control of seventy to one hundred percent of the relevant market is the required range according to other case law). Perhaps if VVL

had alleged that Grace's market share was below 30%, the court would be on steadier ground were it to dismiss VVL's monopolization claim. *See United States v. Aluminum Co. of America ["ALCOA"],* 148 F.2d 416, 424 (2d Cir.1945) (Hand, J.) (stating while 90 percent of the market "is enough to constitute a monopoly, it is doubtful whether sixty or sixty-four percent would be enough[,] and certainly thirty-three percent is not"); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968 (8th Cir.1968) (stating that 20% market share would not be sufficient); *but see Energex Lighting Industries, Inc. v. North American Philips Lighting Corp.,* 656 F.Supp. 914 (S.D.N.Y.1987) (stating that just 25% might be sufficient). But the middle ground in which VVL's complaint places us removes the certainty that comes with a truly insignificant (for purposes of Section 2) market share, because, depending on the structure of the market, a producer could conceivably monopolize with a market share not far below fifty percent. Of course, whether the market structure is amenable to such monopolization cannot be explored on a Rule 12(b)(6) motion.

■ Given the court's conclusion that the market share alleged by VVL provides no basis upon which to dismiss its monopolization claim, *a fortiori* VVL's claim of attempted monopolization cannot be dismissed for lack of market share, because a lesser showing of market share can support an attempted monopolization claim. *See* Hovenkamp, *supra,* Antitrust Law § 6.5.

### 2. ANTICOMPETITIVE CONDUCT

■ To support a claim of monopolization or a claim of attempted monopolization an antitrust plaintiff must point to exclusionary or anticompetitive conduct engaged in by the defendant. VVL alleges that the donation (or suppression of supply) from Grace to HGSI satisfies this requirement.[26] Grace urges that VVL's complaint fails on this front.

---

25. Because VVL's previous complaints alleged that Grace had 51% of the market, and the court had not granted VVL's motion to amend its complaint until the writing of this opinion, Grace has made arguments only with respect to the 51% figure.

26. Although we are accustomed to thinking of donations as desirable acts of generosity to be encouraged, not all donations are so benign. See David Foster Wallace, Infinite Jest 398407 (1996).

825

## a. REFUSAL TO DEAL

Citing *North Carolina Electric Membership Corp. v. Carolina Power & Light Co.* *["NCEMC"]*, 995 F.2d 1063, 1993 WL 193637 (4th Cir.1993) (per curiam) (unpublished), *aff'g*, 1992–1 Trade Cas. (CCH) ¶ 69,805 (M.D.N.C.1992), Grace argues that it had no duty to deal with its competitor, VVL, and therefore cannot be held liable for having failed to do so. As with nearly all of the cases from which Grace seeks succor, *NCEMC* did not arise in the context of a Rule 12(b)(6) motion. The unremarkable proposition for which Grace cites *NCEMC* is that "'a firm with *lawful* monopoly power has no general duty to help its competitors.'" *Id.* at *3 (emphasis added) (quoting *Olympia Equipment Leasing*, 797 F.2d at 375).[27]

■ The court has no quarrel with the principle that competitors (including lawful monopolists) normally can refuse to deal at whim with rivals or to aid competitors. But Grace's argument that no such duty is imposed in this case begs the question. Section 2 imposes a duty to refrain from unlawful monopolization; if the donation (viewed as the intentional suppression of supply) from Grace to HGSI constitutes unlawful monopolization (and VVL has alleged that it does), then the duties imposed upon Grace are not governed by the normal principle.

■ The Supreme Court reaffirmed in *Aspen Skiing*, 472 U.S. at 585, 105 S.Ct. at 2848 (which academia has "overruled," *see* Hovenkamp, *supra*, Antitrust Policy § 7.5 (urging an extremely narrow view of the case); ·Kenneth L. Glazer & Abbott B. Lipsky, Jr., Unilateral Refusals to Deal Under Section 2 of the Sherman Act, 63 Antitrust L.J. 749 (1995) (criticizing approach taken by the Supreme Court in *Aspen Skiing* and citing scholars' theories narrowing scope of holding); Frank H. Easterbrook, On Identifying Exclusionary Conduct, 61 Notre Dame L.Rev. 972 (1986) (questioning the economic underpinnings of *Aspen Skiing,*)) that the right to decline to buy from or to sell to a competitor is not unqualified. A competitor's

unilateral refusal to deal with rivals may violate Section 2 if the purpose or effect is to create or to maintain a monopoly. *See Eastman Kodak Co. v, Image Technical Services, Inc.,* 504 U.S. 451, 483 n. 32, 112 S.Ct. 2072, 2091 n. 32, 119 L.Ed.2d 265 (1992) (citing *Aspen Skiing* ) (stating that right to refuse to deal "is not absolute . . . [and] exists only if there are legitimate competitive reasons for the refusal"); *Aspen Skiing*, 472 U.S. at 600–11, 105 S.Ct. at 2856–62 (upholding jury verdict that rival's failure to continue cooperation in joint marketing arrangement with competitor violated Section 2); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (holding that refusal of newspaper to sell to customers who patronized radio competitor violated Section 2); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (indicating that refusal to sell may be actionable if it is done to achieve monopoly power in a second market).

In *Aspen Skiing*, the antitrust defendant owned three mountains used for downhill skiing in Aspen, Colorado; the antitrust plaintiff owned a fourth mountain in that area. To provide skiers with more flexibility and variety, the plaintiff and the defendant entered into a joint venture, which offered skiers an "all-Aspen" ticket that permitted them to use all four mountains. After several years of cooperation, the defendant withdrew from the deal, and the plaintiff's revenues dropped precipitously. In defending an antitrust suit brought by the plaintiff, the defendant insisted that it had no duty to deal with its competitor. The Supreme Court rejected the argument that under no circumstances could such a duty be imposed. Relying on *Lorain Journal*, the Supreme Court reminded the defendant that, although most businesses have the "right" to choose with whom they deal, the right, as "[m]ost rights[, is] qualified. . . . [It] . . . is neither absolute nor exempt from regulation." *Aspen Skiing*, 472 U.S. at 601–02, 105 S.Ct. at 2857 (internal quotations and citation omitted). Indeed,

---

**27.** *NCEMC* deals with the "essential facilities doctrine," a doctrine by which a lawful monopolist might have a duty to deal with a rival if it controls a resource without which its rival can-

not survive. VVL does not contend that the essential facilities doctrine comes into play in this case. *See* VVL's Objections of October 2, 1995, at 14–15.

the off-forgotten contingency embedded in "rights" is demonstrated again and again in sundry antitrust cases. Making contracts, entering into joint ventures, merging with a rival, acquiring a supplier or a dealer, expanding production, and setting price are all "rights" that may be defeated by the antitrust laws. Thus, one has the "right" to refuse to deal so long as the refusal does not violate Section 2.

Grace emphasizes the differences between this case and the cases indicating the existence of a limited duty to deal. *Aspen Skiing*, Grace underscores, involved circumstances not present here: voluntary cooperation followed by a cessation in dealing. But this factor—a party's withdrawal from a pre-existing relationship—does not rise to the level of importance suggested by Grace's argument.[28] More than anything else, the existence of a joint venture served an evidentiary function: it supported the jury's conclusion that cooperation was profitable to both parties. The absence in this case of any previous cooperation may well become relevant at a subsequent stage in this case (i.e., summary judgment), but on a Rule 12(b)(6) motion it cannot be dispositive. The Court in *Aspen Skiing* made no indication that the prior cooperation with an antitrust defendant was a prerequisite to the plaintiff's claim; furthermore, the Court relied on *Lorain Journal* where previous cooperation was not an issue.

Grace's stronger argument comes down to this: that *Aspen Skiing* is a bad decision and should be limited to its facts; in other words, when ski slopes, joint ventures, and Aspen, Colorado are not involved, the rationale of *Aspen Skiing* should not govern. As mentioned above, commentators and lower courts have shown a similar distaste of *Aspen Skiing*. *Olympia Equipment Leasing*, 797 F.2d at 379 (Posner, J.) ("The *Aspen [Skiing]* decision, on which [the plaintiff] naturally rests the main weight of its argument, is narrowly written. If it stands for any principle that goes beyond its unusual facts, [the principle is not present here].""). This court sympathizes with the desire to narrow *Aspen Skiing* (for it takes a very broad view of

Section 2), but, once again, Rule 12(b)(6) constrains the court. Even accepting that *Aspen Skiing* controls only the rarest case, it cannot be determined at this stage that the case before the court does not qualify. At the risk of repeating itself, the court observes that Rule 12(b)(6) permits dismissal only when *no* set of facts can be proven to support the plaintiff's complaint. To do more than speculate that *Aspen Skiing* will not apply would be premature. As the Fourth Circuit explained (in a case without skiing, prior cooperation, or Aspen), "[t]he [antitrust defendants] may be correct in their assertion that *Aspen Skiing* only ... [applies] in very limited circumstances. Even if *Aspen Skiing* is so limited, it cannot be determined from the allegations of the plaintiff's complaints that such circumstances were not present [here]." *Advanced Health–Care*, 910 F.2d at 148 n. 16 (citation omitted).

Furthermore, while VVL's Section 2 claims may appear to be tantamount to an assertion that Grace had an obligation to deal, a closer examination belies the notion that VVL's claims depend on the existence of a duty to deal. Part of the *remedy* VVL seeks would require Grace to deal; but the anticompetitive act VVL attacks is not necessarily Grace's failure to sell VVL its vermiculite holdings. Rather, VVL challenges as exclusionary Grace's donation or suppression of supply. The distinction may appear specious, but consider that if, instead of donating its holdings to HGSI, Grace had sold them to a new market entrant (even one who had no intention of dealing with VVL), the nature of any Section 2 claim (assuming VVL would bring such a claim) would be very different from that presently before the court.

Nor is the court persuaded by the hypothetical that if Grace could have held onto the land perpetually without violating the antitrust laws, it can give the land to whomever it wishes, because the result of either action would be the same. The court knows of no exemption from antitrust liability for companies that buy up scarce resources only to ensure their disuse by fellow competitors (the worst case scenario). In any event, the court is relieved of deciding whether Section

28. For a contrary view, *see* Herbert, Federal Antitrust Policy § 7.5 (1994).

2 liability would attach to this hypothetical case, because that is not the case before the court today. The case before the court involves a transfer effecting a substantial suppression of supply of a scarce resource by a firm alleged to have monopoly power. Such a suppression of supply may qualify as an exclusionary act, *see* Herbert Hovenkamp, *supra*, Antitrust Policy § 7.1, and, therefore, the court finds that VVL has adequately alleged anticompetitive conduct within the meaning of Section 2.

### b. LEGITIMATE BUSINESS REASON

Graces urges that even if its donation to HGSI could otherwise be viewed as exclusionary and even if it had a limited duty to deal with VVL, its legitimate business reason in making the donation absolves it from antitrust liability. Grace turns against VVL its own concession: Grace received a "sizeable" tax deduction by acceding to HGSI's long-standing demands for its vermiculite holdings. This tax benefit, Grace contends, qualifies as a legitimate business reason justifying its conduct. *See City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1379 (9th Cir.1992) (cautioning that "even when the monopolist does refuse aid partially because it wishes to restrict competition, [the court] determine[s] antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct") (internal quotations and citations omitted).

■■■ The court has given up its fears of undue repetition, for it has little choice but to echo its earlier rejoinder to Grace: whether Grace had a legitimate business reason for its conduct is a question of fact, not to be decided on a Rule 12(b)(6) motion; the allegation that it received a substantial tax deduction certainly supports Grace's position, but it does not conclusively undermine that of VVL. Hence, at least at this stage of the analysis, Grace cannot prevail on its "legitimate business justification" argument.

### 3. CAUSAL ANTITRUST INJURY

In deciding the question whether VVL has adequately alleged causal injury for purposes of Section 2, one cannot simply rest on the analysis performed in connection with VVL's Section 1 claim. Unlike with Section 1, VVL can now make the argument that Grace's unilateral decision to donate its holdings to HGSI proximately caused VVL's injury. From the allegations in VVL's complaint, it is possible to conclude that "but for" the donation to HGSI, Grace might have sold its vermiculite holdings to VVL. First, Grace agreed to entertain an offer from VVL; second, Grace may well have been reluctant to incur the cost of holding onto land without putting it to any productive use; and third, the complaint mentions no interested parties other than HGSI and VVL.

■■■ Grace suggests, however, that VVL has failed adequately to plead antitrust injury. This argument cannot be accepted. VVL, as a consumer of vermiculite mining rights, suffers from reduced availability and higher prices of vermiculite mining rights. As a producer of vermiculite concentrates, VVL has alleged that the suppression of scarce vermiculite supply has caused a decline in the value of its business.[29] The injury to VVL mirrors the potential injury to consumers of vermiculite concentrates, who may face reduced availability and higher prices of vermiculite concentrates. These types of injuries are precisely the kind that the Sherman Antitrust Act seeks to prevent. Accordingly, the court finds that VVL has adequately alleged antitrust injury.

### 4. ANTICOMPETITIVE INTENT NECESSARY FOR ATTEMPTED MONOPOLIZATION

■■■ In an argument reminiscent of its "legitimate business reason" defense, Grace contends that any allegation of anticompetitive intent on its part is refuted by its invitation to VVL to make an offer for its vermiculite holdings. Rule 12(b)(6) does not provide

---

**29.** The court notes that, at least in the short term, it is not implausible to assume that VVL may benefit from a suppression in supply; a reduction in output resulting in a price increase will redound to the benefit of VVL, whose vermi- culite will command higher prices. Were this the only "injury" that appeared possible from VVL's complaint, VVL would not be deemed to have suffered antitrust injury.

the appropriate forum to resolve this factual dispute. While VVL's complaint does not allege the offer was a sham, neither does the complaint contain any allegation that forecloses such a possibility. To the contrary, VVL alleges Grace had the requisite anticompetitive intent. Hence, the court rejects Grace's argument that VVL has failed to plead anticompetitive intent required for attempted monopolization and conspiracy to monopolize claims.

### 5. AGREEMENT BETWEEN HGSI AND GRACE FOR CONSPIRACY TO MONOPOLIZE

#### a. HGSI

For the reasons stated in Part IV.A.1–3, the claim alleging that HGSI violated 15 U.S.C. § 2 by entering into a conspiracy to monopolize must be dismissed. *See DELTA,* 50 F.3d at 714 (holding that neither Section 1 nor Section 2 applied because the defendant did not engage in trade or commerce).

#### b. GRACE

For the reasons stated in Part IV.A.4, Grace cannot escape liability for allegedly conspiring to monopolize under 15 U.S.C. § 2 only by virtue of the fact that HGSI cannot be held liable under that section. *See Advanced Health–Care,* 910 F.2d at 150.

### 6. LACHES

The Clayton Act furnishes a statute of limitations for damages claims, 15 U.S.C. § 15b (four year statute of limitations); it provides no statute of limitations for plaintiffs who request only injunctive relief. Grace argues that laches bars VVL from seeking divestiture because the face of its complaint reveals it to be guilty of unjustified delay: although, according to the complaint, VVL learned of Grace's intention to donate its holdings in 1992, VVL failed to file suit until 1995. VVL, armed with case law from the Ninth Circuit, counters that generally the defense of laches must fail if suit is brought within the statute of limitations supplied in the Clayton Act for damages actions. *See Aurora Enterprises, Inc. v. National Broadcasting Co.,* 688 F.2d 689, 694 (9th Cir.1982).

The court is less convinced by the legal rule than by the ambiguities in VVL's complaint. On the one hand, a significant time lag separated Grace's first donation to HGSI and VVL's attack upon the donation, and the court has little trouble crediting Grace's claims of prejudice. On the other hand, other facts alleged in VVL's complaint indicate that there may have been excusable reason for its delay: for instance, the parties were involved in state court proceedings relating to the conveyances, and VVL may have been awaiting their conclusion. Grace paid only cursory attention to this issue in its brief, leading the court to conclude that resolution of the laches issue should be postponed until a possible summary judgment phase.

### 7. DISPOSITION OF SECTION 2 CLAIMS

Because VVL has colorably alleged all elements necessary to support a claim against Grace for monopolization, attempted monopolization, and conspiracy to monopolize, the court holds that VVL's Section 2 claims cannot be dismissed on a Rule 12(b)(6) motion. Lest this conclusion overwhelm the narrowness of the court's holding, the court reiterates that Rule 12(b)(6) does not kill cases easily; it would be an overly broad construction of Rule 12(b)(6) to interpret it as a filter of all dubious claims. Those who read this opinion as ushering in an expansive era of Section 2 liability for corporate donations, refusals to deal, or attempted withdrawals from the market are guilty of a misreading. The court's holding is far less remarkable. The court merely holds, on the facts of this case, (1) that a market share of fifty percent (or somewhere below fifty percent) alone does not conclusively foreclose the possibility of monopoly power, and (2) that a competitor's suppression of a substantial supply of a scarce and valuable resource may constitute an anticompetitive act under Section 2.

## VII.  VVL'S STATE LAW CLAIMS

### A.  CLAIMS UNDER THE VIRGINIA ANTITRUST ACT

The Virginia Antitrust Act prohibits "[e]very contract, combination or conspiracy in restraint of trade or commerce," Va.Code

§ 59.1–9.5, and "[e]very conspiracy combination, or attempt to monopolize, or monopolization of; trade or commerce." *Id.* § 59.1–9.6. VVL's claims under the Virginia Antitrust Act are governed by the same standard as its claims under the Sherman Antitrust Act. *See Satellite Television & Assoc. Resources v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 358 n. 13 (4th Cir. 1983). Therefore, VVL's claims under the Virginia Antitrust Act must be dismissed, except insofar as they allege unlawful monopolization, attempted monopolization, and conspiracy to monopolize against Grace; claims under § 59.1–9.5 are dismissed and claims under § 59.1–9.6 remain against Grace. For the same reasons that HGSI cannot be held liable under the Sherman Antitrust Act, it cannot be held liable under the Virginia Antitrust Act.

### B. CLAIMS FOR CIVIL CONSPIRACY UNDER VIRGINIA STATE LAW

Section 18.2–499 of the Virginia Code criminalizes the combination of any two people who act in "concert together for the purpose of ... willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." The parties agree that civil liability attaches only when the plaintiff can demonstrate that the defendants "contrived to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Carpenter v. Drechsler*, 1991 WL 332766, *8 (W.D.Va.1991) (internal quotations and citations omitted) (Michael, J.), *aff'd mem.*, 19 F.3d 1428 (4th Cir.1994). Under this standard, HGSI cannot be held liable for civil conspiracy because the court has found, as a matter of law, that the only claim of illegal conduct against it must fail. Grace, however, can be held liable under § 18.2–499, because VVL has alleged that its conduct was illegal, and the court has determined that these allegations survive the Rule 12(b)(6) stage.

### VIII. PEERS' STATE LAW CLAIMS

As Grace indicates, a Rule 12(b)(6) motion will not be converted into a motion for summary judgment pursuant to Fed. R.Civ.P. 56 if a document referenced within a complaint is considered by the court. *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D.Va.1995). Hence, the court will consider, in analyzing Grace's motion to dismiss, the contract referenced in the Peers' complaints. The Peers suggest that the court consider—in addition to the facts alleged in the complaints, the contractual agreements, and the governing law—a hypothetical layperson's reaction to the Peers' allegations. The court believes an exercise focusing on a hypothetical layperson, aside from being wholly unproductive, would not be appropriate; the court's job in this case is to apply law to facts, not to speculate about what an average person on the street feels about contract law.

### A. UNJUST ENRICHMENT

Under Virginia law, the existence of an express contract governing a transaction between parties bars a claim for unjust enrichment (a form of implied or quasi-contract) based on that transaction. *See Bright v. QSP., Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (citing *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988) (per curiam)). As discussed above, Grace and the Peers entered into an express contract for the sale of the Peers' farm land. Grace's contract with both sets of Peers left it with unfettered discretion to mine or not to mine; review of both agreements reveals that both parties had foreseen the possibility that Grace might never mine. Grace's June 18, 1996 Motion to Dismiss, Exhibits E & G. According to the agreement with Peers I, the decision whether to mine was "within the sole discretion of [Grace]"; the agreement specifically relieved Grace of any "legal obligation" to mine. Exhibit E, ¶ 5(A). Further, the agreement contemplated that Grace might never mine, for the agreement imposed upon Grace the duty to notify the Peers I if the land were resold, because, "[p]rovided there ha[d] been no mining whatsoever of the premises," the Peers I had the option of purchasing the land from Grace. *Id.* ¶ 1(C). The agreement with Peers II paralleled the contract with Peers I with respect to discretion bestowed upon Grace:

mining was "at the sole option of [Grace]." Exhibit G, p. 3.

■ The Peers concede that generally an injured party cannot recover on an implied or quasi-contract theory in the face of an express contract. They make no argument that Grace ever had any obligation to mine. Nor do the Peers dispute that the agreement between themselves and Grace permitted Grace to dispose of the holdings by contracting with a third-party. *See* Peers' July 23, 1996 Opposition at 8. The Peers insist, however, that claims for unjust enrichment are not barred by an express contract unless such claims contravene the express contractual terms. Because nothing in their express agreements anticipated Grace's "trick," urge the Peers, a claim for unjust enrichment is not contrary to the express terms and is thus permitted under Virginia law. Although the Peers cite *Nedrich v. Jones*, 245 Va. 465, 477, 429 S.E.2d 201 (1993), to support this argument, *Nedrich* does not stand for any such proposition. As Grace points out, if anything, *Nedrich* teaches to the contrary. In that case, the employer expressly promised to pay an employee a bonus for all leases executed by the employer; a lease was executed, but the employee received no bonus payment. The court in *Nedrich* ruled that, pursuant to the contract, this was proper, because the employer's general partnership, and not the employer, was shown to have executed the lease, and therefore the employer was found to have no obligation to pay the employee a bonus. An extra-contractual cause of action was not allowed, although nothing in the contract indicated that the employee anticipated this seemingly technical distinction between the employer and his partnership (or, in the Peers' language, "trick").

The Peers seize upon a lone sentence in *Nedrich,* with which they attempt to bolster their untenable position. The court states that "[t]he law will not impose an implied contractual relationship upon the parties *in contravention* of an express contract." 245 Va. at 477, 429 S.E.2d 201 (citation omitted and emphasis added). *Nedrich* did not elaborate on the precise definition of "contravention"; thus, the Peers step into its shoes. So

narrow is their construction of the term, that, with their interpretation, virtually any plaintiff claiming unjust enrichment could circumvent the rule permitting recovery on the express contract only. For instance, in this case, the Peers would have the court hold that no express contractual clause governed the donation by Grace, because the agreements between the parties never mentioned the possibility of such a donation or the tax deduction that accompanied it. The parties' failure to refer in their agreements to a possible donation or tax deduction is of little consequence. The contracts defined the duty to pay royalties, and it is the alleged breach of those duties that the Peers challenge. The question whether the contracts countenance Grace's "trick" must be reserved as a matter of contractual interpretation.

■ The Peers' final argument is based on selected quotations from *Texas Company, Inc. v. Northup*, 154 Va. 428, 153 S.E. 659 (1930), a case which the Peers tear from its context in an ill-fated effort to twist its reasoning to fit this very different case. In *Northup*, the Virginia Supreme Court held merely that a "total or substantial failure of consideration," so flagrant that the court inferred that the defendant-appellant was guilty of "duress[,] ... actual fraud in the procurement[,] ... [or] constructive fraud," entitled the injured party to rescission. 154 Va. at 444–45, 153 S.E. 659. The defendant-appellant and plaintiff-appellee had entered into three separate agreements on the same date; two of the agreements contained termination clauses, but the third did not. The defendant-appellant exercised its right of termination on the former agreements but refused to terminate the latter agreement. This ploy permitted the defendant-appellant to extract all benefits from the three agreements (which the court interpreted in unison) while depriving the plaintiff-appellee of any benefit. This result, the court reasoned, could only have been achieved by (constructively) fraudulent means, because the plaintiff-appellee bore all the costs of the transaction and received no gain. Here the parties' agreements contemplated the possibility that Grace would *never* mine the land; indeed, in the twenty years preceding the donation,

Grace did not mine, and the Peers did not complain. *See* Peers' July 23, 1996 Opposition at 14. Thus, there can be no serious assertion that the contracts fail for lack of consideration, let alone a failure of consideration from which (constructive) fraud may be inferred. To the extent counsel for Peers suggest otherwise, their efforts are unavailing. Consequently, the Peers' unjust enrichment claim must be dismissed; if the Peers are to have a remedy, it must be gotten from the express contracts into which they entered with Grace.

## B. BREACH OF CONTRACTUAL DUTY TO EXERCISE DISCRETION IN GOOD FAITH

The Peers argue that Grace breached its contractual duty to exercise its discretion not to mine in good faith. Grace responds that no duty of good faith can be implied when such a duty would contradict the express agreement governing the transaction. The parties agree on the law: contractual duties should be exercised in good faith, but a duty of good faith cannot be implied so as to trump an express contractual provision. *Mahoney v. NationsBank of Virginia,* 249 Va. 216, 455 S.E.2d 5 (1995). The only issue is whether the agreements between Grace and the Peers expressly authorized Grace to make a donation to HGSI with the proviso that HGSI never mine the land.

*Mahoney* and the more recent case of *Charles E. Brauer Co. v. NationsBank,* 251 Va. 28, 466 S.E.2d 382 (1996), provide insight on this question. Both cases indicate that clear contractual language should be given its plain meaning; *Mahoney* and *Brauer* support this court's view that "sole discretion" means what it says. In *Mahoney,* the Virginia Supreme Court for the first time considered whether an express contractual right to exercise discretion could be challenged for "[un]reasonabl[ness], ... [im]proper motiv[ation], ... arbitrari[ness, or simply because the discretion was exercised] in a manner inconsistent with the parties' reasonable expectations." 249 Va. at 219, 455 S.E.2d 5. The Virginia Supreme Court concluded that imposition of such requirements would be inconsistent with the very notion of discretion, a right to act at will without justification. Examining case law from other jurisdictions, *Mahoney* cited with approval a Second Circuit case holding that an agreement providing for "[t]ermination ... by either party with 30 days written notice," left no room for a claim that the termination was exercised in bad faith. *Id.* at 220, 455 S.E.2d 5 (citing *Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 674 (2d Cir.1985)). Following the reasoning of *Mahoney,* the Virginia Supreme Court in *Brauer* declined to erode the right of discretion by grafting upon the right a duty to act nonarbitrarily. 251 Va. at 35, 466 S.E.2d 382 (agreeing with the plaintiff-appellant that the defendant-appellee's exercise of discretion was "[a]rguably ... arbitrary," but rejecting the notion that the defendant-appellee had a duty to exercise its contractual right of discretion nonarbitrarily).

The agreements between Grace and the Peers specifically state that Grace, solely at its discretion, will decide whether to mine. Even if its decision permanently to foreclose mining was exercised in bad faith or contrary to the Peers' expectations, Grace nonetheless had the right to exercise its discretion as it liked. Grace bargained for this important contractual right and should not be robbed of it. The Peers attempt to evade the applicable law by arguing that nothing in the contract granted Grace the right to donate the property in return for a tax deduction. This borders on the ridiculous. How Grace used the property once it decided not to mine is irrelevant. Grace's decision not to mine need not be justified by any reason, and, therefore, cannot be defeated by a "bad" reason. For this same reason, the Peers claim that Grace could have "passively" declined to mine, but could not achieve this same result "actively" must fail. Moreover, the active/passive distinction, while not infrequently surfacing in the case law, does little to advance the discussion, since, as the legal realists have shown us, anything can be characterized and recharacterized as passive or active. *Cf.* Louis Michael Seidman, The State Action Paradox, 10 Const. Comment. 379, 398 (1993). Therefore, the Peers claim that Grace breached an implied duty of good

faith must be rejected and the claim dismissed.[30]

## C. BREACH OF CONTRACTUAL DUTY TO PAY ROYALTIES OR CONSTRUCTIVE MINING

■ Constructive eviction, constructive discharge, constructive taking; 'why not constructive mining?' query the Peers. This heretofore unheard of cause of action would enable the Peers to recover royalties for vermiculite that had never actually been mined by Grace or HGSI on the theory that Grace received all the benefits it would have gained by mining the land but without compensating the Peers, as it would have had to do had Grace actually mined the land. Even if the court were inclined to recognize the unprecedented cause of action of "constructive mining," this would not be the case to do it. Pursuant to the express contract, Grace had every right to transfer the land to a third party and receive in exchange compensation (whether in the form of a tax deduction or a sale price) for the value of the land and the minerals beneath it, even with the knowledge that the third party would never mine the land. To force Grace to disgorge the benefits of its transfer to HGSI would have the same effect as would imposing upon Grace a duty to exercise its discretion in good faith. Therefore, the Peers' constructive mining must be dismissed.

## D. WASTE AND CONVERSION

■ The Peers last claims are, alternatively, waste (applicable to real property ) or conversion (applicable to personal property). Waste is "[a] destruction or material alteration or deterioration of the freehold, or of the improvements forming a material part thereof, by any person rightfully in possession, but who has not the fee title or the full estate." *Chosar Corp. v. Owens*, 235 Va. 660, 663, 370 S.E.2d 305 (1988). Conversion is "[a]n unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the

alteration of their condition or the exclusion of the owner's rights." Black's Law Dictionary 332 (6th ed.1990). Without an allegation of wrongful conduct, there can be no cause of action for waste or conversion. *See Vicars v. First Virginia Bank–Mountain Empire*, 250 Va. 103, 109, 458 S.E.2d 293 (1995); *Kavanaugh v. Donovan*, 186 Va. 85, 91, 41 S.E.2d 489 (1947) (waste); *Acorn Structures*, 846 F.2d at 926 (conversion). As discussed above in connection with the Peers' other state law claims, Grace's donation to HGSI was authorized by the agreements between Grace and the Peers. Therefore, as a matter of law, neither the Peers' claim for conversion nor waste can stand.

## IX. SUMMARY

The circumstances in the case brought by VVL distinguish it from most antitrust cases. The court does not anticipate that it (or other courts) will often encounter such a curious mix: a scarce, valuable resource donated to an entity which vows never to use it; a corporation whose profits are, in part, derived from exploitation of the resource it has permanently surrendered; and a rival which resolves to reverse the transaction in order to extract the resource. All the makings of a mystery novel are contained in this strange brew. The court's holding should not be viewed in isolation, without reference to the unique nature of this case, particularly insofar as VVL's Section 2 claims are concerned.

Having sounded this cautionary note, the court states as follows. HGSI is dismissed as a defendant in this case. All claims brought by the Peers are dismissed. Count I of VVL's complaint is dismissed; insofar as Count V asserts an unlawful conspiracy in restraint of trade (comparable to Section 1 of the Sherman Antitrust Act), it is dismissed. The following counts remain against Grace: Count II (monopolization under the Sherman Antitrust Act), Count III (attempted monopolization under the Sherman Antitrust Act), Count IV (conspiracy to monopolize under

---

**30.** The Peers rely on a Virginia state law decision (to which HGSI, but not Grace, was a party) holding that failure to mine, even in the face of a "sole discretion" clause, is subject to a duty of good faith. That court, however, did not have

the benefit of *Mahoney v. NationsBank of Virginia*, 249 Va. 216, 455 S.E.2d 5 (1995), and *Charles E. Brauer Co. v. NationsBank*, 251 Va. 28, 466 S.E.2d 382 (1996).

the Sherman Antitrust Act), Count V (monopolization, attempted monopolization, and conspiracy to monopolize under the Virginia Antitrust Act), and Count VI (conspiracy to injure another in trade, business, or profession). The case is remanded to the Magistrate for further proceedings consistent with this Memorandum Opinion. All are urged to expedite this litigation, which has dragged on far too long.

An appropriate Order shall this day issue.